UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:20-cr-00072-JAW-1 |
| | ) | |
| MARCUS MELLO | ) | |
| | ) | |
| Defendant | ) | |

**ORDER ON MOTION TO SEVER AND EXCLUDE REFERENCE TO A DECEDENT'S DEATH**

With trial looming, the Court denies a defendant's motion to sever for trial two drug distribution counts on the ground that evidence of a drug purchaser's death would likely be admissible in the trial of both counts if tried separately. The Court denies wholesale exclusion of evidence of the decedent's death, but it will keep a watchful eye on this evidence at trial to determine whether it meets the requirements of Federal Rule of Evidence 403.

## I.    BACKGROUND

### A.    The Charges

On October 8, 2020, a federal grand jury indicted Marcus Mello in a one-count indictment, charging him with the distribution of fentanyl on May 8, 2020, a violation of 21 U.S.C. § 841(a)(1), and claiming a forfeiture of property related to the alleged crime.[1]  *Indictment* (ECF No. 27).  On May 5, 2021, a federal grand jury issued a superseding indictment against Mr. Mello, containing three counts and two forfeiture allegations: 1) Count 1 echoed the single count in the original indictment, the fentanyl

---

[1]    As will be discussed, on July 16, 2020, the Government initiated a single-count criminal complaint relating to an alleged May 8, 2020 distribution of fentanyl.  *Criminal Compl.* (ECF No. 3).

distribution charge in the complaint, 2) Count 2 alleged that Mr. Mello possessed with intent to distribute 40 grams or more of a mixture containing fentanyl on July 17, 2020, also an alleged violation of 21 U.S.C. § 841(a)(1), and 3) Count 3 alleged that Mr. Mello possessed a firearm, namely a CZ, model P-10, 9 mm pistol, in furtherance of the drug trafficking crime alleged in Count 2, an alleged violation of 18 U.S.C. § 924(c)(1)(A).  *Superseding Indictment* at 1-3 (ECF No. 51).  The superseding indictment contained two forfeiture allegations related to all three counts in the superseding indictment, the first demanding all property used to commit or facilitate the commitment of the offenses in Counts 1 and 2, including United States currency, and the second demanding forfeiture of the P-10 pistol described in Count 3 of the superseding indictment.  *Id.* at 2-3.

**B.    The Defense Motion to Sever and Exclude**

With jury selection set for August 1, 2023 and trial to start on August 28, 2023, on June 30, 2023, Marcus Mello filed a motion to sever for trial purposes count one of the superseding indictment from the trial of counts two and three and to exclude any reference to the death of a person to whom the Government alleges Mr. Mello sold controlled substances.  *Def.'s Mot. to Sever Count One and to Exclude any Reference to Decedent's Death* (ECF No. 112) (*Def.'s Mot.*).  On July l7, 2023, the Government responded in opposition to the motion.  *Gov't Resp. in Opp'n to Def.'s Mot. to Sever Count One and Exclude any Reference to Decedent's Death* (ECF No. 113) (*Gov't Opp'n*).  On July 21, 2023, Mr. Mello filed his reply.  *Def.'s Reply to Gov't Resp. in*

*Opp'n to Def.'s Mot. to Sever Count One and Exclude any Reference to Decedent's Death* (ECF No. 118) (*Def.'s Reply*).

## II.   FACTUAL OVERVIEW

The Court sets forth a synopsis of the facts underlying the charges against Mr. Mello as he described them in his motion.   Mr. Mello says that on May 8, 2020, Kennebunk Fire Rescue was dispatched to a convenience store for a non-responsive female at 8:44 p.m. *Def.'s Mot.* at 1.  The medical providers arrived six minutes later and observed two women in a motor vehicle, one was A.K., a known drug user, and she was slumped over in the passenger seat and non-responsive.   *Id.*  The driver of the vehicle was C.C. and, although responsive, she was lethargic and incoherent.   *Id.* The medical providers smelled alcohol on A.K.'s breath and observed oral secretions draining, copious amounts of fluid in her mouth, and bruising and a hematoma on her head.   *Id.*  After several rounds of CPR and Narcan, the medical providers ceased their efforts and A.K. was pronounced dead at 9:23 p.m.   *Id.* at 1-2.  A search of A.K.'s cellphone revealed that she had taken Klonopin, and C.C. later disclosed that she and A.K. went to South Portland to purchase pills and had snorted some pills before returning to Kennebunk.  *Id.* at 2.

A.K.'s body was taken to Bibber's Memorial Chapel and staff located in A.K.'s bra a small plastic bag with gold skulls and a black background containing ten blue pills imprinted with a "30" on one side and an "M" on the other.   *Id.*  Through New England Poison Control and drugs.com, law enforcement identified the pills as 30 mg doses of Oxycodone, which were later tested and found also to contain fentanyl.   *Id.*

3

at 2, n. 2.  The autopsy revealed a recent head injury, a blood alcohol level of 0.178%, and positive findings for fentanyl, hydrocodone, diazepam, cyclobenzaprine, and bupropion.  *Id.* at 2.  The law enforcement investigation led to Mr. Mello and the Government contends that Mr. Mello sold A.K. twelve pills on May 8, 2020 for $300 in South Portland.  *Id.*  It is these allegations that give rise to Count 1.  *Id.*

On July l7, 2020, law enforcement arrested Mr. Mello pursuant to a warrant for the distribution of fentanyl related to the events of May 8, 2020.  *Id.*  At the time of his arrest, Mr. Mello possessed a backpack and law enforcement obtained a search warrant for the backpack.  *Id.*  There were several containers in the backpack and inside one were multiple plastic baggies containing about 400 pills, which gave rise to Count 2 of the superseding indictment, and inside another was a firearm, which gave rise to Count 3 of the superseding indictment.  *Id.*

## III.        THE PARTIES' POSITIONS

### A.    The Defendant's Motion

#### 1.    Severance

Citing Federal Rules of Criminal Procedure 8 and 14, Mr. Mello reviews the provisions of the Rules that allow joinder of criminal offenses and that permit severance of counts.  *Id.* at 2-3.  Mr. Mello asks the Court to sever Count 1 from the remaining counts "due to the prejudice that will arise if the charges are tried together."  *Id.* at 3.  Mr. Mello explains the prejudice as follows.  He notes that in Count 1, he is charged with distributing fentanyl to A.K.  *Id.*  Mr. Mello assumes that the Government will seek to introduce evidence that there was fentanyl in A.K.'s

blood and will also present evidence of how witnesses came to possess her blood for testing. *Id.* Mr. Mello says that because the Government will not call A.K. as a trial witness and because the evidence will show that the blood sample was taken from A.K. on the day of the alleged distribution, the jury will "likely infer that she died and may attribute her death to Mr. Mello." *Id.* at 3. Furthermore, Mr. Mello says that "to the extent that the Government calls any lay witnesses including A.K.'s family and friends, they may present tearfully and emotionally during their testimony and that could also infer to the jury that A.K. has died." *Id.* For these reasons, Mr. Mello contends that the Court should "sever count 1 from the remaining two counts." *Id.*

### 2.   Exclusion

Mr. Mello also urges the Court to "issue an order prohibiting the Government and its witnesses from referencing, suggesting, or otherwise inferring A.K.'s death during trial." *Id.* Mr. Mello notes that the Government has not charged him with causing A.K.'s death and, "therefore, the Government need not prove that she died." *Id.* Thus, "the fact of A.K.'s death is not relevant as it is not probative to any fact that the jury must decide in this matter." *Id.* at 3-4. Instead, Mr. Mello contends, "evidence of A.K.'s death would be overly prejudicial and would likely cause a jury to find Mr. Mello guilty as to all counts — not on the merits, but because of the sympathy that jurors feel for A.K." *Id.* at 4. Mr. Mello argues that under Federal Rule of Evidence 403, "any probative value of the fact of A.K.'s death is substantially outweighed by the danger of unfair prejudice and confusing the issues." *Id.*

### B.   The Government's Opposition

1.     **Supplemental Facts**

In its opposition, the Government sets forth facts that supplement Mr. Mello's factual recitation. *Gov't's Opp'n* at 2-9. The Government identifies as "Person 1" the female driver identified as C.C. in Mr. Mello's motion; Person 1/C.C. was present in the motor vehicle with A.K. on May 8, 2020. *Id.* at 2. The Government says that Person 1/C.C. was "conscious but appeared lethargic and incoherent" and that she was later issued a criminal summons for operating under the influence. *Id.* Law enforcement searched the motor vehicle and discovered prescription pill bottles with A.K.'s name and labelled as Amitriptyline and Cyclobenzaprine. *Id.*

On May 9, 2020, when the Medical Examiner's Office discovered a baggie containing ten blue pills in A.K.'s clothing, the pills were imprinted with "30" on one side and "M" on the other, and their appearance and stamping were consistent with 30-mg Percocet. *Id.* However, subsequent analysis revealed that the pills contained fentanyl, not oxycodone. *Id.* at 2-3.

Person 1/C.C. is anticipated to testify:

1) on May 8, 2020, she and A.K. travelled to South Portland, Maine to obtain drugs;

2) A.K. had the connection to the drug supplier, whom Person1/C.C. knew as Mello;

3) A.K. had been drinking so Person 1/C.C. drove her to meet Mello;

4) They arrived at a location in South Portland, where A.K. met Mello by train tracks;

5) A.K. and Person 1/C.C. snorted some pills Mello had obtained;

6) After A.K. died, Person 1/C.C. texted Mello and asked him what he sold to A.K. and Mello responded that he had found "perks" for A.K.;

7) Person 1/C.C. accompanied A.K. to previous meetings with Mello; and

8) Person 1/C.C. knew Mello to be a white male with an upside down cross tattooed on his forehead.

*Id.* at 3. On July 14, 2020, Detective Stephen Borst showed Person 1/C.C. a series of photographs, and Person1/C.C. identified the Defendant as Mello. *Id.* at 4.

Law enforcement examined Person 1/C.C.'s cellphone and discovered a text conversation between Person 1/C.C. and a person named "Mellow" in which she informed him that A.K. was dead and quizzed him about what was in the pills. *Id.* "Mellow" said that he did not know what was in the pills, but he thought they were all "perks." *Id.*

Law enforcement also examined A.K.'s cellphone and found a text conversation on May 8, 2020 from 1:24 p.m. to 8:02 p.m. between A.K. and Mello at the same cellphone number Person 1/C.C. later used to reach "Mellow". *Id.* at 5-6. These text messages appear to set up a drug deal in which A.K. purchased twelve pills for $300 from the Defendant. *Id.*

Laboratory tests of A.K.'s blood revealed that she had ingested multiple drugs, including fentanyl, and the medical examiner opined that A.K. died from "acute fentanyl, hydrocodone, diazepam, and cyclobenzaprine toxicity." *Id.* at 6.

On July 16, 2020, law enforcement issued a federal criminal complaint against Mr. Mello, charging him with the distribution of fentanyl to A.K. on May 8, 2020. *Id.* On July 17, 2020, law enforcement arrested Mr. Mello in South Portland pursuant to

an arrest warrant. *Id.* He was wearing a backpack and had a cellphone. *Id.* Upon arrest, Mr. Mello denied selling fentanyl to A.K. but admitted selling pills to her, saying he did not know the pills contained fentanyl. *Id.* Mr. Mello acknowledged that he had to take responsibility for A.K.'s death and said that he had gotten the pills on the black market. *Id.* Mr. Mello confirmed his cellphone number is the same number used by both A.K. and Person 1/C.C. to text him. *Id.* Mr. Mello also acknowledged that his backpack contained a firearm, marijuana, and money for his rent. *Id.*

Law enforcement searched Mr. Mello's backpack pursuant to a search warrant and discovered:

1) $6,354 in currency;

2) a loaded CZ model P-10 handgun with 14 full metal jacket bullets in the magazine;

3) ten round white pills; and

4) 417 blue pills marked "M 30".

*Id.* at 6-7. The blue pills were similar in appearance to the blue pills found on A.K.'s clothing. *Id.* at 7. Laboratory testing of the blue pills in Mr. Mello's backpack revealed that they contained fentanyl. *Id.*

A law enforcement examination of Mr. Mello's cellphone pursuant to a search warrant revealed contacts from March 2020 to July 2020 between Mr. Mello and "Chop", who appeared to be Mr. Mello's source for the drugs. *Id.* at 8-9. On July 13, 2020, Mr. Mello wrote Chop that business was slow because of "all these deaths" and "no one wanna die." *Id.* at 9.

### 2.   Severance and Exclusion

The Government first argues that the Court should deny Mr. Mello's motion to sever because it is untimely.  *Id.* at 9-10.

Next, the Government contends that Counts One, Two and Three were properly joined pursuant to Federal Rule of Criminal Procedure 8(a) in the superseding indictment because they "are of the same or similar character, or are based on the same act or transactions, or are connected to or constitute parts of a common scheme or plan."  *Id.* at 10 (quoting FED. R. CRIM. P. 8(a)).  The Government next argues that A.K.'s death is relevant to Count 1, and its exclusion would lead to a disjointed narrative.  *Id.* at 10-14.  Turning to Federal Rule of Criminal Procedure 14, the Government maintains that Mr. Mello has not demonstrated that Count 1 should be severed from Counts 2 and 3 due to prejudice.  *Id.* at 14-16.  Furthermore, the Government says that A.K.'s death would be admissible in a trial on Counts 2 and 3 if these Counts were severed for trial.  *Id.* at 16-18.

### C.   Marcus Mello's Reply

In Mr. Mello's view, the Government's opposition "highlights exactly the unfair prejudice that Mr. Mello is concerned about" because, even though the Government has not charged him with A.K.'s death, Mr. Mello believes that the Government is going to make her death "a central theme of its case in chief and presentation to the jury."  *Def.'s Reply* at 1.  Mr. Mello contends that there is "zero relevance" for admission of any evidence of A.K.'s death "[o]ther than inflaming the jury."  *Id.*  In support of his position, Mr. Mello cites *United States v. Johnson*, 996 F.3d 200 (4th

Cir. 2021) in which the Fourth Circuit vacated a drug conviction because the prosecution introduced evidence that a buyer had died, even though the government had not charged the death as part of the crime. *Def.'s Reply* at 3-4.

## IV.  LEGAL STANDARDS

### A.  Joinder

Federal Rule of Criminal Procedure 8(a) provides:

> **(a) Joinder of Offenses.** The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

The First Circuit has "construed this rule generously in favor of joinder." *United States v. Boulanger*, 444 F.3d 76, 87 (1st Cir. 2006). Under First Circuit law, "'similar' does not mean 'identical'", and the assessment is made at the time the Government decided to join separate counts into one charging indictment. *Id.* "In determining whether counts are properly joined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred." *Id.* (quoting *United States v. Taylor*, 54 F.3d 967, 973 (1st Cir. 1995)).

### B.  Severance

Federal Rule of Criminal Procedure 14(a) provides:

> **(a) Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

10

In *Boulanger*, the First Circuit asked whether the evidence in one count would likely be admitted in the trial of the other count, if tried separately.  444 F.3d at 88; *see United States v. Stackpole*, 811 F.2d 689, 694 (1st Cir. 1987) (rejecting the defendant's severance argument and noting that "were the counts severed, substantially the same evidence would have been admitted in both resulting trials").   Also, in *Boulanger*, the First Circuit observed that "the district court instructed the jury that each count charged a separate offense and that each had to be considered separately, without allowing the verdict on one count to affect the verdict on any other count. These instructions minimized any possible prejudice from the joinder." *Id.* (quoting *United States v. Melendez*, 301 F.3d 27, 36 (1st Cir. 2002)) (internal citation and quotation marks omitted).

### C.   Exclusion

Federal Rule of Evidence 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

## V.   DISCUSSION

### A.   Timeliness

Although the Government correctly states that this motion is not timely,[2] current defense counsel were appointed on December 20, 2021 and June 2, 2023, after

---

[2]        The Government says that the motion deadline was May 13, 2021.  *Gov't's Opp'n* at 9.  This is not quite correct.  Magistrate Judge Rich's May 13, 2021 amended procedural order established a motion deadline of June 28, 2021.  *Am. Procedural Order* (ECF No. 56).  The correct date does not diminish the Government's point that the motion to sever is late.

the expiration of the motion deadline. The Court accepts defense counsel's representation that the parties had attempted to resolve this case without trial and the motion to sever was filed only when it became apparent that trial would be necessary. Furthermore, the Court is not inclined effectively to default the Defendant and refuse to reach the merits of his motion, especially in view of the fact this is a criminal case. In its discretion, the Court therefore reaches the merits, despite the late filing.

### B.    Joinder

The Court easily resolves the Rule 8 joinder issue in favor of the Government. Counts 1 and 2 charge Mr. Mello with violating the same statute and indeed charge him with the illegal distribution of the same controlled substance, fentanyl. Although the purchasers of illegal substances are not generally considered victims under federal law, the location of Mr. Mello's distribution on May 8, 2020 and his arrest and drug possession on July 17, 2020 was the same, South Portland, Maine, and the timeframe of the conduct, May 8 and July 17 of the same year, fit well within the First Circuit's guidance in *Boulanger*.

### C.    Severance

The prejudice that Mr. Mello has identified from the joint trial of Counts 1 and 2 is that the jury will be biased against him if there is evidence that A.K., the alleged recipient of his May 8 drug sale, died as a consequence of her ingestion of the drugs he sold her. Mr. Mello views the possible testimony about A.K.'s death as emotional and traumatic.

One question that the First Circuit has focused on in addressing severance issues is whether "even if the counts had been severed and tried separately, similar evidence would have been used." *Boulanger*, 444 F.3d at 88. Putting aside the exact nature of the evidence the Government wishes to present concerning A.K.'s death, the Court concludes that evidence that A.K. died after ingesting drugs she purchased from Mr. Mello would be admissible in both trials, if Count 1 and Count 2 were tried separately. It seems plain that evidence of A.K.'s death would be admissible in a trial of the drug distribution charge in Count 1 because Mr. Mello's text conversation with Person 1/C.C. after A.K.'s death constitutes a series of admissions about Mr. Mello as the source of the distributed drugs, one of the elements of the distribution crime charged in Count 1. *See Judge Torresen, Pattern Jury Instructions for the District Cts. for the First Circuit*, § 4.21.841(a)(1)B (last updated, Aug. 27, 2015). Furthermore, the text exchange between Person 1/C.C. and Mr. Mello following A.K.'s death contains Mr. Mello's admission that he did not know what was in the drugs he allegedly distributed, which is a defense admission and admissible on Count 1. The Court cannot envision how that evidence could be admitted without Person 1/C.C.'s accusation that A.K. died from taking one of Mr. Mello's pills.

Similarly, evidence of Mr. Mello's prior drug dealing on May 8, 2020 would be admissible in the trial of Count 2 to demonstrate that he was in the business of drug dealing on July 17, 2020 and his possession was not inadvertent or for personal use. In addition, evidence of A.K.'s death would be admissible to prove that Mr. Mello was in the business of drug distribution on July 17, 2020, when he had just indicated to

13

his supplier that business was slow due to the deaths, and no one wants to die. More broadly, A.K.'s death seems integral to the narrative of the actual events in both cases and to forbid reference to A.K.'s death would leave the jury with an artificially truncated description of the events leading to Mr. Mello's July 17, 2020 arrest and the searches following his arrest.

The First Circuit "has repeatedly refused to overrule a denial of severance if substantially the same evidence would have been admitted in separate trials." *United States v. Richardson*, 515 F.3d 74, 82 (1st Cir. 2008) (citing *United States v. Burgos*, 254 F.3d 8, 14 (1st Cir. 2001); *United States v. Freeman*, 6 F.3d 586, 598 (9th Cir. 1993); *Stackpole*, 811 F.3d at 693-94; *United States v. O'Connell*, 703 F.2d 645, 649 (1st Cir. 1983)) (alterations in ordering); *United States v. Soto*, No. 2:17-cr-00157-JAW, 2019 U.S. Dist. LEXIS 68406 (D. Me. Apr. 23, 2019).

In *Jordan*, the First Circuit identified three types of prejudice from joining different offenses that may warrant severance:

> (1) the defendant may become embarrassed or confounded in presenting separate defenses; (2) proof that defendant is guilty of one offense may be used to convict him of a second offense, even though such proof would be inadmissible in a second trial for the second offense; and (3) a defendant may wish to testify in his own behalf on one of the offenses but not another, forcing him to choose the unwanted alternative of testifying as to both or testifying as to neither.

112 F.3d at 17 (quoting *United States v. Scivola*, 766 F.2d 37 (1st Cir. 1985)). Although Mr. Mello claims that the Government would present emotional testimony, he has not identified why his defenses would be different in defending Count 1 from

14

Count 2, and he has not claimed that he would wish to testify on one of these charges but not the other if the trials were separate.

Finally, although Mr. Mello has not expressly asked the Court to instruct the jury that it must consider the evidence in each count separately, this is a usual instruction, and the Court anticipates giving it in this case. If so, any potential prejudice from trying Count 1 with Counts 2 and 3 will be mitigated. *See United States v. Mangual-Santiago*, 562 F.3d 411, 426 (1st Cir. 2009) (quoting *United States v. Bucci*, 525 F.3d 116, 127 (1st Cir. 2008) (Courts "ordinarily presume that jurors will follow limiting instructions")).

Based on the record before it, the Court rejects Mr. Mello's request for severance of Count 1 from Counts 2 and 3.

### D.    Exclusion

The Court has discussed the probative value of evidence of A.K.'s death for both Count 1 and Count 2. There would be some prejudice to Mr. Mello from the admission of evidence of A.K.'s death for the obvious reason that the jury will learn that one of Mr. Mello's alleged customers died shortly after the alleged sale and the decedent had fentanyl in her bloodstream, the same drug that Mr. Mello is charged with distributing. Alleged drug traffickers are often not viewed sympathetically by jurors, but if there is a suggestion that someone died from the trafficked drugs, the jury might well be more inclined to convict. But Rule 403 does not prohibit the admission of prejudicial evidence, only unfairly prejudicial evidence.

15

Against the prejudicial impact of this evidence is its significant probative value.  Evidence that A.K. died after ingesting fentanyl not only provides the context for Person 1/C.C. and Mr. Mello's text exchange, but also explains Mr. Mello's later comment to Chop that business was slow because people were dying, and no one wants to die.  On this point, Mr. Mello's rejoinder that in making this comment, Mr. Mello may not have been referring to A.K.'s death is weak.  Even if a jury could determine there is no direct evidence that Mr. Mello was discussing A.K.'s May 8, 2020 death when he texted Chop on July 13, 2020, a jury could draw a reasonable inference that Mr. Mello was referring in part to A.K.'s death.  This inference is buttressed by Mr. Mello's own admission upon his July 17, 2020 arrest that he had to take responsibility for A.K.'s death.  Absent admission of evidence of A.K.'s death the events in this case, leading to the charges, would be chopped up, truncated, and difficult to follow.  From the Court's perspective, it would be the exclusion of this evidence, not its admission, that would likely confuse the jury.

The Court has one caveat.  Whether the fentanyl in her bloodstream was a legal cause of A.K's death is not a matter the jury will be asked to resolve, and in view of the wide variety of substances in her bloodstream as confirmed by the laboratory results, causation between fentanyl and her death might be difficult to prove.  But it appears that both Person 1/C.C. and Mr. Mello believed that the fentanyl contributed to A.K.'s death, and their belief led Mr. Mello to make admissions from which a jury could conclude demonstrate he distributed fentanyl on May 8, 2020 and possessed fentanyl with the intention to distribute it on July 17, 2020.

The Court does not know what evidence the Government intends to present to demonstrate A.K.'s death after she ingested the pills Mr. Mello allegedly sold her; however, as the Government has not charged Mr. Mello with causing A.K.'s death from distributing fentanyl, it would seem that the causation issue between A.K.'s ingestion of fentanyl and her death would have limited relevance to whether Mr. Mello distributed fentanyl to her on May 8, 2020, which is the charge. Indeed, upon request, the Court will consider expressly instructing the jury that Mr. Mello has not been charged with causing A.K.'s death, and evidence of her death has been admitted solely for the drug distribution charges before the court, an instruction that would mitigate any prejudice. The Court invites the parties, particularly Mr. Mello, to propose a jury instruction on this narrow issue. Certainly, if —as Mr. Mello fears — the Government intends to present testimony of A.K.'s relatives about the impact of her death, the Court is dubious that such evidence would be admissible under any scenario.

Mr. Mello's motion seeks the exclusion of any reference to A.K.'s death, and the Court denies that relief because the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice or other Rule 403 factors. However, the Court will keep a watchful eye on the Government's evidence of A.K.'s death beyond what is necessary to prove its drug distribution charges against Mr. Mello.

## VI.     CONCLUSION

The Court DENIES the Defendant's Motion to Sever Count One and to Exclude

any Reference to Decedent's Death (ECF No. 112).

SO ORDERED.


                                        /s/ John A. Woodcock, Jr.
                                        JOHN A. WOODCOCK, JR.
                                        UNITED STATES DISTRICT JUDGE

Dated this 31st day of July, 2023